UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.                                                         Case No. 15-CR-47

COREY D. MITCHELL,

    Defendant.

## RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

On March 17, 2015, a grand jury sitting in the Eastern District of Wisconsin returned a two-count indictment against defendant Corey D. Mitchell ("Mitchell"). The indictment charges him with armed bank robbery, in violation of 18 U.S.C. § 2133(a) and (d) and with use of a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Mitchell was arraigned on the charges and entered a plea of not guilty. Jury trial before the Honorable Lynn Adelman is adjourned pending resolution of pretrial motions.

Before me is Mitchell's motion to suppress evidence recovered and statements made following his March 6, 2015 arrest. Mitchell further seeks to suppress an identification made at a March 8, 2015 lineup and bar any later in-court identification by the same witness. (Docket # 16.) In his motion to suppress, Mitchell makes four arguments: (1) that the police lacked probable cause to arrest Mitchell; (2) that Mitchell was not promptly brought before a magistrate judge in violation of the *McNabb-Mallory*[1] rule; (3) that authorities held Mitchell for more than four days before a judicial officer found probable cause for his arrest in

---

[1] *McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).

violation of *Riverside*[2]; and (4) that Mitchell was denied his Sixth Amendment right to counsel at the lineup. After obtaining additional discovery from the government, Mitchell withdrew his *Riverside* claim. (Docket # 20 at 14.) I then conducted an evidentiary hearing on Mitchell's motion and the parties submitted post-hearing briefs. Following the hearing, Mitchell indicated that he was also withdrawing the *McNabb-Mallory* claim. (Docket # 33 at 2.) Thus, the remaining issues before me are whether the police had probable cause to arrest Mitchell and whether Mitchell was denied his Sixth Amendment right to counsel at the lineup. For the reasons that follow, I recommend that the defendant's motion to suppress for lack of probable cause to arrest be denied. As to Mitchell's motion to suppress an identification made at a March 8, 2015 lineup, I recommend that the court find that Mitchell's lineup was held in violation of his Sixth Amendment right to counsel. However, it is premature at this juncture to decide the admissibility of any potential in-court identification; therefore I recommend that the court reserves ruling on this issue until trial.

**FACTS**

Here, I recount the facts from the evidentiary hearing relevant to the motion to suppress for lack of probable cause. The facts relevant to the lineup are undisputed and are discussed in that portion of the analysis.

1.  *Special Agent Benjamin Hruz*

Special Agent Benjamin Hruz ("Special Agent Hruz") has been employed as a Special Agent with the FBI for approximately 18 years. (Transcript of May 12, 2015 Evidentiary Hearing ("Tr.") at 5, Docket # 31.) Special Agent Hruz works on the Violent Crimes Task Force, which is comprised of two FBI agents and six Milwaukee Police

---

[2]*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991).

Department detectives. (*Id.*) The Task Force primarily investigates bank robberies and armed commercial robberies. (*Id.*) Special Agent Hruz is the bank robbery coordinator, which means that he is responsible for maintaining Wisconsin's portion of the FBI database of bank robberies. (Tr. at 6.)

Special Agent Hruz's involvement in Mitchell's case began on the Monday after the robbery. (*Id.*) Special Agent Hruz was advised that a robbery had taken place the previous Friday and began reviewing the case and talking to the people involved. (*Id.*) Special Agent Hruz testified that he was generally familiar with the use of GPS technology in the investigation of bank robberies. (Tr. 11.) Special Agent Hruz testified that the majority of banks in his jurisdiction utilize technology from a company called 3SI. (*Id.*) He stated that 3SI technology utilizes a banded money with a secreted transponder inside of it. (*Id.*) The money packs with the transponder are maintained in various locations inside of the bank, including in the drawers, and are placed on top of a base plate. (Tr. 11-12.) When removed from the base plate, it begins to transmit a signal that is relayed to various law enforcement agencies, including the FBI. (Tr. 12.) Once the signal goes off, there is also mapping technology that the company utilizes so the device can be tracked using GPS satellite technology. (*Id.*) The viewer can see if the device is moving or stationary. (*Id.*)

Special Agent Hruz explained that once the signal goes off, an alert is sent via text message and e-mail to various members of law enforcement, including the Intelligence Fusion Center in Milwaukee. (Tr. 13.) Once the signal is picked up by the Intelligence Fusion Center, the Center broadcasts updates regarding the location of the device to the applicable police district. (*Id.*) The 3SI company also provides a summary sheet of data to

3

Case 2:15-cr-00047-LA   Filed 06/25/15   Page 3 of 18   Document 34

law enforcement. (*Id.*) Special Agent Hruz explained that the tracker is updated every 5-6 seconds. (Tr. 15.)

Special Agent Hruz identified the summary data sheet from 3SI for the events that occurred on March 6, 2015. (Tr. 15, Exh. 2.) Special Agent Hruz testified that the data sheet indicated that the tracker was updated every six seconds. (Tr. 15.) Special Agent Hruz further explained that the data sheet shows the precise latitude, longitude, and then a corresponding closest address of the tracking device, which is how most people determine the tracker's location. (*Id.*) Special Agent Hurz stated that the sheet also depicts whether the tracking device was stationary, whether it was moving, and its approximate speed. (*Id.*) Finally, it gives the number of satellites that are receiving the signal. (Tr. 15-16.) Special Agent Hruz testified that based on the speed of the tracker, he can determine whether the tracker is moving or stationary. (Tr. 16.) Special Agent Hruz stated that speeds in excess of 10-15 miles per hour would likely be in a vehicle. (*Id.*) Special Agent Hruz also testified that the Milwaukee Police Department refers to the GPS as a confidential source. (*Id.*) Special Agent Hruz acknowledged, however, that he was not at the dispatch center when the robbery occurred and has no personal knowledge of what the dispatcher was looking at during the relevant time period. (Tr. 17.)

    2.    *Officer Joshua Albert*

Officer Joshua Albert ("Officer Albert") has been employed as a police officer doing street patrol with the Milwaukee Police Department for just over six years. (Tr. 30-31.) Officer Albert was working on the morning of March 6, 2015 when he was pulled out of roll call to respond to a bank robbery that had just occurred. (Tr. 31.) Officer Albert was working that day with his partner, Officer Catherine Anderer. (*Id.*) Officer Albert was

4

Case 2:15-cr-00047-LA   Filed 06/25/15   Page 4 of 18   Document 34

driving their patrol car. (Tr. 36.) Officer Albert testified that as he and his partner were leaving the District, they were receiving updates via their squad radio that the person who had committed the robbery was moving. (Tr. 33.) They stopped their patrol car at 49th Street and North Avenue and shut off their lights and siren, because they were told the subject was traveling towards their direction. (*Id.*) Officer Albert testified that they continued to receive updates and were told that the suspect was traveling north on 48th Street from Garfield, which is one block south of 49th Street and North Avenue, where Officer Albert's patrol car was sitting. (*Id.*) As the dispatch came in, Officer Albert looked a block over to his east and observed one vehicle just pulling up to the stoplight. (*Id.*) Officer Albert testified that he knew this was the target vehicle because it was the only vehicle traveling northbound on 48th Street and was the only vehicle stopped waiting for the light to change. (Tr. 35.) Albert continued to sit and wait for further updates. (Tr. 33.)

While Officer Albert was waiting, the vehicle proceeded to make a right turn onto North Avenue and travel eastbound. (Tr. 33-34.) Approximately one minute later, Officer Albert received an update from the Intelligence Fusion Center that the subject was now going north on 46th Street. (Tr. 34, 36.) Albert saw the vehicle that turned off of 48th Street onto North Avenue turn north on 46th Street from North Avenue. (Tr. 34.) Officer Albert then broadcast a description of the vehicle and the number of occupants he believed were in the vehicle. (*Id.*) Officer Albert testified that although there were other vehicles traveling eastbound on North Avenue, only one vehicle turned left to head north on 46th Street. (Tr. 37.)

Officer Albert then proceeded to 46th Street and North Avenue, where he turned northbound. (Tr. 34.) An unmarked police car was also traveling in the same direction,

5

Case 2:15-cr-00047-LA   Filed 06/25/15   Page 5 of 18   Document 34

directly in front of Officer Albert's vehicle. (*Id.*) Officer Albert continued to proceed north on 46th Street towards West Wright Street, where the unmarked police car turned right to go east on West Wright Street. (*Id.*) At that time Officer Albert was informed that the subject was proceeding south on 45th Street. (*Id.*) Officer Albert did not see any other vehicles in the vicinity of West Wright Street and North 45th Street. (Tr. 39.)

As he approached the intersection of West Wright and North 45th Street, the unmarked squad turned to go south on 45th Street, and Officer Albert proceeded to make a right turn to go south as well. (*Id.*) Officer Albert then observed a vehicle that was parked with the driver's side door open that matched the exact vehicle that he saw on North 48th Street. (Tr. 39-40.) At that point, Officer Albert activated the emergency lights, which prompted the unmarked squad to stop. (Tr. 40.) Four officers, Officer Albert and Officer Anderer, as well as the two officers in the unmarked squad, exited their vehicles and Officer Albert began giving commands to the driver of the vehicle that was pulled over and parked. (*Id.*) Officer Albert testified that he had his firearm drawn and once the suspect got out of the vehicle, he was handcuffed. (Tr. 44.) Officer Albert testified that it was hectic at this time because the officers were trying to take the vehicle's driver into custody, but there were people at the residence who were out on the porch yelling at the officers. (Tr. 40.) The officers were trying to ascertain whether anyone from the vehicle had gone into the house or if there was anyone from the house that was going to come out while they were trying to conduct the investigation. (Tr. 40-41.)

Officer Albert acknowledged that while he was following the target vehicle, he did not have any information beyond the vehicle's location and direction of travel. (Tr. 43.) He was unaware of the suspect's gender, age, race, dress, or any information about the vehicle

6

Case 2:15-cr-00047-LA   Filed 06/25/15   Page 6 of 18   Document 34

itself. (*Id.*) The only information Officer Albert knew was what he received from the dispatcher and the dispatcher only told him the direction of travel and location. (*Id.*) Further, the dispatcher referred to the information as coming from a confidential source. (Tr. 44.) Officer Albert testified that he had no personal knowledge about where the dispatcher was getting its information from. (Tr. 45-46.)

## ANALYSIS

As previously stated, the remaining issues before me are whether the police had probable cause to arrest Mitchell and whether Mitchell was denied his Sixth Amendment right to counsel at the lineup. I will address each in turn.

1. *Probable Cause to Arrest*

Mitchell argues that he was arrested without a warrant and without probable cause in violation of his Fourth Amendment rights. He moves to suppress the evidence resulting from his arrest. The government does not dispute that Mitchell was arrested without a warrant. (Docket # 32 at 2-3, 8.) Thus, the only issue before me is whether there was probable cause to support Mitchell's arrest.

The Fourth Amendment protects persons against "unreasonable searches and seizures" and against arrests without probable cause. U.S. Const. Am. IV. Whether an arrest is constitutionally valid depends upon whether "at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Determinations of probable cause are naturally based on probabilities, and a finding of probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir.2003) (internal quotation and citation omitted). In making probable cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience. *Id.* To determine whether an officer had probable cause to arrest an individual, the court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotation and citation omitted).

In evaluating probable cause, I look only to the information known to the officer at the time of arrest. *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011). Officer Albert, the arresting officer, testified that he was working on the morning of March 6, 2015 when he was pulled out of roll call to respond to a bank robbery that had just occurred at a U.S. Bank located between 52nd and 53rd Street on North Avenue. (Tr. 31-33.) Officer Albert testified that as he and his partner were leaving the District, they were receiving updates via their squad radio that the person who had committed the robbery was moving. (Tr. 33.) They stopped their patrol car at 49th Street and North Avenue and shut off their lights and siren, because they were told the subject was traveling towards their direction. (*Id.*) Officer Albert testified that they continued to receive updates and were told that the suspect was traveling north on 48th Street from Garfield, which is one block south of 49th Street and North Avenue, where Officer Albert's patrol car was sitting. (*Id.*) As the dispatch

came in, Officer Albert looked a block over to his east and observed one vehicle just pulling up to the stoplight. (*Id.*) Officer Albert testified that he knew this was the target vehicle because it was the only vehicle traveling northbound on 48th Street and was the only vehicle stopped waiting for the light to change. (Tr. 35.) Officer Albert continued to sit and wait for further updates. (Tr. 33.) Officer Albert then testified as to how he followed the suspect vehicle based on updates he received from dispatch as to the vehicle's location. (Tr. 33-40.) Finally, once the suspect vehicle stopped in front of a house, it was the only vehicle in sight for three houses. (Tr. 41.)

Mitchell argues that the government failed to establish probable cause because the only information known to Officer Albert at the time of Mitchell's arrest was the information he received from police dispatch, which was the location and direction of travel of a suspect received from an unknown and unidentified "confidential source." I disagree. Officer Albert was not relying on information from an untested confidential informant or a citizen witness; he was relying on information he received from police dispatch. Mitchell fails to explain, and I fail to see why, a police officer cannot reasonably rely on information from the police dispatch. This, in my view, is no different from relying on information from other police officers. Police officers routinely receive information from police dispatch and as Officer Albert testified, he had no reason to disbelieve the information he received over dispatch. (Tr. 46.) Officer Albert testified that the path of the suspect vehicle matched the location and direction of travel relayed by dispatch, which further lent credence to the reliability of dispatch's information. Moreover, Officer Albert testified that there was one vehicle in the location relayed by dispatch initially, and one vehicle in the location relayed by dispatch when the vehicle stopped. Officer Albert testified that it was the same vehicle.

9

Case 2:15-cr-00047-LA    Filed 06/25/15    Page 9 of 18    Document 34

Additionally, Officer Albert did not act immediately upon seeing the car. He waited for further updates which confirmed that he had narrowed in on the correct vehicle. Thus, I find that Officer Albert reasonably relied on dispatch to obtain information regarding the suspect vehicle.

To the extent Mitchell's argument is that the information Officer Albert had was insufficient for probable cause, under the facts of this case, this argument also fails. It is true that Officer Albert did not have a physical description of the suspect. He also did not have a description of the vehicle. But the record is uncontroverted that the only vehicle following the path that dispatch was broadcasting was what turned out to be Mitchell's car.

Mitchell also argues that the government failed to present any information about where dispatch was getting its information. I agree that there is a gap of direct evidence as to the source of dispatch's information. The government attempted to make this link through Special Agent Hruz's testimony. But, Special Agent Hruz testified that he had no personal knowledge as to what the dispatcher was actually looking at when providing the information over the police radio. What is established through Special Agent Hruz's testimony is that GPS tracking was used in this bank robbery. Special Agent Hruz identified and interpreted the raw data provided by 3SI in this robbery based on his experience generally with the use of 3SI's technology in bank robberies. Special Agent Hruz also testified generally as to how the police dispatch uses 3SI's raw data. Although he testified that he did not know exactly what dispatch was relying on during its broadcast, this appears to be indirect evidence that dispatch in this case was relying on the information from 3SI. But even if I reject this evidence as indirect or circumstantial, ultimately the question is what did the arresting officer know at the time of arrest and what was the source of his

information. Again, in this case, Officer Albert was receiving and responding to information from dispatch that a bank robbery had just occurred, the suspect was on the move, and dispatch was directing him to the path the suspect was traveling. I am not persuaded that it was unreasonable for him to rely on such information.

Finally, Mitchell argues that even assuming dispatch was relying on the GPS data, the government failed to present evidence regarding the veracity and reliability of the data. In so arguing, Mitchell essentially equates the tracking device to a human confidential informant (seemingly because the GPS device is referred to as a "confidential source" over police radio). The confidential informant analysis only has limited application here. The GPS tracker is not a human being, so the usual concern with informants, such as veracity and disinterest, are not at issue. However, whether the technology being used is accurate and reliable does come into play. Special Agent Hruz, Wisconsin's bank robbery coordinator for the FBI, testified that the majority of the banks in his jurisdiction (i.e., the State of Wisconsin) employ technology from 3SI, and explained in detail how 3SI's tracking technology works. (Tr. 11-16.) Special Agent Hruz also testified that law enforcement receives a summary report of tracking data from 3SI and in every case involving a GPS tracker, a map is kept showing the device's location updates. (Tr. 14.)

Further, at least one circuit has found that a court may take judicial notice of the accuracy and reliability of GPS technology. *See United States v. Brooks*, 715 F.3d 1069, 1078 (8th Cir. 2013). The *Brooks* court stated that:

> We cannot conclude that the district court abused its discretion in taking judicial notice of the accuracy and reliability of GPS technology. Commercial GPS units are widely available, and most modern cell phones have GPS tracking capabilities. Courts routinely rely on GPS technology to supervise individuals on probation or supervised release, and, in assessing the Fourth

> Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy.

*Id.* Thus, even if it was necessary for the government to show that dispatch's source of information was reliable, I find that the GPS data was reliable. In the end, whether an arrest is constitutionally valid depends on whether at the moment of arrest the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information was sufficient to warrant a prudent man in believing the person had committed or was committing an offense. *See Beck*, 379 U.S. at 91. Here, Officer Albert had information that the person or persons who just robbed a bank were traveling a specific route. Given his continuous observation of the car traveling that route, he had probable cause to approach that car and arrest its occupant.

> 2. *Right to Counsel at Lineup*

Mitchell argues that he was denied his Sixth Amendment right to counsel during a lineup that was conducted on the Sunday following his arrest. He moves to suppress the identification made at a March 8, 2015 lineup. "It is axiomatic that the right to counsel attaches 'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *United States v. Larkin*, 978 F.2d 964, 969 (7th Cir. 1992) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). The right to counsel "presumptively does not attach at pre-indictment lineups." *Id.* A defendant, however, may rebut this presumption by demonstrating that, despite the absence of formal adversary judicial proceedings, "'the government had crossed the constitutionally significant divide from fact-finder to adversary.'" *Id.* (quoting *United States ex rel. Hall v. Lane*, 804 F.2d 79, 82 (7th Cir. 1986)). This line is crossed when the

prosecution "becomes aligned against the accused." *United States v. Bentley*, 956 F.2d 272, 1992 WL 36800, *1 (7th Cir. 1992) (unpublished).

In this case, Mitchell was arrested on Friday, March 6, 2015 and the lineup was conducted on Sunday, March 8, 2015. (Tr. 28.) Mitchell's case was presented to the United States Attorney's Office on Monday, March 9, 2015 and the U.S. Attorney's Office confirmed that it would take the case that evening. (Tr. 7-8.) However, prior to the case being presented to the U.S. Attorney's Office, a probable cause finding was made by a judicial officer (a Court Commissioner) in Milwaukee County. (Docket # 23-1.) The probable cause finding was made on March 8, 2015 at 8:45 a.m. (*Id.* at 2.) The judicial officer found probable cause that Mitchell committed the offense of armed robbery of a bank and set bail at $50,000. (*Id.*) The form notes that it is distributed to the "arrested person." (*Id.*)

The parties dispute whether the probable cause finding by the Milwaukee County Circuit Court triggered Mitchell's Sixth Amendment right to counsel at the lineup. This same issue was presented in *United States v. West*, No. 08-CR-157, 2009 WL 5217976 (E.D. Wis. Mar. 3, 2009). In *West*, as in this case, a Milwaukee County Circuit Court Commissioner signed a form entitled "Probable Cause Statement and Judicial Determination." *See id.* at *6. Also like this case, the court commissioner in *West* found probable cause and set bail at $50,000. *Id.* There was no indication in *West*, as in this case, that the defendant appeared before the Court Commissioner. *Id.* As in this case, the form in *West* stated that it was distributed to the "Arrested Person/Counsel." *Id.* Judge Goodstein determined that West's right to counsel under the Sixth Amendment was triggered upon the judicial officer's probable cause determination and that the lineup was conducted in

violation of West's Sixth Amendment right. *Id.* at *10. In making that determination, Judge Goodstein first noted that a "paper-only review by a judicial officer is Milwaukee County's chosen approach . . . to comply [with] the Supreme Court's holding that the Fourth Amendment ordinarily requires a judicial determination of probable cause within 48 hours of a person's arrest" under *Riverside*. *Id.* at *7 (internal citations omitted).

Second, Judge Goodstein relied on *Rothgery v. Gillespie County*, 554 U.S. 191 (2008). At issue in *Rothgery* was whether the right to counsel attached for an initial appearance before a magistrate in Texas state court where probable cause was found, bail was set, and the defendant was informed of the charges against him. *Id.* at 195. The Court held that "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel," and found that the defendant's right to counsel did attach at this initial hearing held by the Texas court. *Id.* at 212-13. Judge Goodstein opined that the only difference between Milwaukee County's procedure and that of the Texas court at issue in *Rothgery* was the fact that the defendant was not required to appear in person. 2009 WL 5217976, at *8. Judge Goodstein found that this fact did not meaningfully distinguish West's case from the defendant's in *Rothgery* because Milwaukee County's all-paper system was simply its method of complying with *Riverside*. *Id.* at *9.[3]

The government argues that a subsequent Seventh Circuit decision, *United States v. States*, 652 F.3d 734 (7th Cir. 2011), belies Mitchell's argument that the state judicial officer's probable cause determination triggered his Sixth Amendment right to counsel at the

---

[3]West's case went before the Seventh Circuit. However, the issue of when the right to counsel attached was not before the court. *See United States v. West*, 628 F.3d 425 (7th Cir. 2010).

lineup. In *States*, the government filed a criminal complaint charging the defendant with multiple violations of federal criminal law. *Id.* at 741. The defendant argued that the complaint constituted formal judicial proceedings such that Sixth Amendment protections came into play. *Id.* The *States* court, citing *Rothgery*, found that the filing of a criminal complaint under Rule 3 of the Federal Rules of Criminal Procedure does not "mark[] the start" of the adversary judicial proceedings; rather, the initial appearance under Rule 5 triggers the Sixth Amendment's protections. *Id.* Thus, the government argues that if a criminal complaint, where an individual is formally charged with a crime, proceeds the start of adversary judicial proceedings, then a state's probable cause determination, which is not a formal charge, must not trigger the Sixth Amendment. (Docket # 19 at 9.)

I am not convinced that *States* changes the analysis here. Filing a federal criminal complaint, as was at issue in *States*, is different. At the time of the filing of the complaint, the judicial officer does not give any notice to the defendant or restrict his liberty. That comes later at the initial appearance. This sometimes happens on the same day—but not always. Whereas under the Milwaukee County procedure, the probable cause determination both gives notice to the defendant and restricts his freedom. As Judge Goodstein reasoned, such a system triggers the Sixth Amendment right to counsel under *Rothgery*. In my view, this case is identical to *West* and different from *States*. Thus, I recommend that the court find Mitchell's lineup was held in violation of his Sixth Amendment right to counsel.

Suppression of evidence, however, "has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). The government argues that even if this Court finds that Mitchell's right to counsel at the lineup was violated, the witness should still be allowed to make an in-court identification. (Docket # 19 at 10.) Mitchell

15

argues that this issue need not be addressed now and can be dealt with at trial through an offer of proof. (Docket # 23 at 7.)

"The Supreme Court held in [*United States v.*] *Wade*, 388 U.S. 218, 240 (1967) that, where a lineup has been suppressed as unlawful, 'a per se rule of exclusion of courtroom identification would be unjustified.'" *West*, 628 F.3d at 428 (citing *Wade*, 388 U.S. at 240). The *West* court continues: "To allow a witness to make an in-court identification after an uncounseled lineup identification, however, the government must show by clear and convincing evidence that there is an independent basis for a witness's in-court identification." *Id.* Whether an in-court identification is sufficiently independent of a tainted pretrial identification under *Wade* presents a mixed question of law and fact. *United States v. West*, 528 Fed. Appx. 602, 604 (7th Cir. 2013) (unpublished).

A court must consider the following factors, which are not exclusive, when deciding whether a witness has a sufficient independent basis to provide a reliable and admissible in-court identification: "'the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.'" *Id.* (quoting *Wade*, 388 U.S. at 241). Here, I agree with Mitchell that on the record before me, I cannot make a *Wade* finding as to the admissibility of any potential in-court identification and recommend that the court reserves ruling on this issue until trial.

## CONCLUSION

For the reasons explained above, I find that Officer Albert had probable cause to arrest Mitchell and recommend that portion of Mitchell's motion to suppress be denied. I also find that Mitchell's Sixth Amendment right to counsel attached when the Milwaukee County Court Commissioner made a probable cause finding and set bail and recommend that the court find that the lineup was conducted in violation of Mitchell's Sixth Amendment right to counsel. However, I find it premature to make a *Wade* finding and recommend that the court reserves ruling on the admissibility of any potential in-court identification until trial.

**NOW, THEREFORE, IT IS RECOMMENDED** that the defendant's motion to suppress (Docket # 16) be **GRANTED IN PART AND DENIED IN PART**. I recommend that Mitchell's motion to suppress evidence recovered and statements made following his March 6, 2015 arrest on the grounds that the arresting officer lacked probable cause to arrest him be **DENIED**. I further recommend that Mitchell's motion to suppress an identification made at a March 8, 2015 lineup on the grounds that his Sixth Amendment right to counsel was violated be **GRANTED**. However, I recommend that the court reserves ruling on the admissibility of any potential in-court identification until trial.

Your attention is directed to General L.R. 72(c), 28 U.S.C. § 636(b)(1)(B) and Federal Rules of Criminal Procedure 59(b), or Federal Rules of Civil Procedure 72(b) if applicable, whereby written objections to any recommendation or order herein, or part thereof, may be filed within fourteen days of the date of service of this recommendation or order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent

directly to the chambers of the district judge assigned to the case. Failure to file a timely objection with the district court shall result in a waiver of a party's right to appeal. If no response or reply will be filed, please notify the Court in writing.

Dated at Milwaukee, Wisconsin this 25th day of June, 2015.

BY THE COURT

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge